[No. 10708. Department One. April 10, 1913.]

FRANK LACAFF, *Respondent*, v. ROSLYN-CASCADE COAL COMPANY, *Appellant*.[1]

MASTER AND SERVANT—SAFE PLACE—COAL MINE—EVIDENCE—QUESTION FOR JURY. Where miners were required to follow their cars down an incline, without sufficient light, where depressions were constantly forming between the rails, so that when a co-employee stumbled and lost his hold on a car, it ran down the incline upon the plaintiff and injured him, the questions as to the reasonable safety of the place and sufficient inspection are for the jury.

SAME—ASSUMPTION OF RISKS—QUESTION FOR JURY. A coal miner, required to follow cars down an incline, does not, from his knowledge of the general condition of the ground, assume the risks of a co-

[1]Reported in 131 Pac. 194.

employee stumbling in a depression and losing control of a car which came down upon him, where it was the duty of the track man to make a daily inspection of the track.

SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. In such a case, a miner is not guilty of contributory negligence, as a matter of law, in making a customary stop without looking back, to put an extra brake on his car, which was apparently necessary by reason of a change in the grade of the incline.

SAME—PLEADING, ISSUES AND PROOF—"OBSTRUCTIONS" ON TRACK. Under an allegation of negligence in allowing "obstructions" between the rails of a track in a coal mine, which caused a miner to stumble and lose control of a car, it is admissible to prove a "depression" between the rails.

Appeal from a judgment of the superior court for Kittitas county, Kauffman, J., entered April 17, 1912, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a coal miner through defective appliances. Affirmed.

*Kerr & McCord*, for appellant.

*Pruyn & Hoeffler* and *E. K. Brown*, for respondent.

PARKER, J.—The plaintiff, a coal miner, seeks recovery of damages for personal injuries which he claims resulted to him from the negligence of the defendant in its defective maintenance of a track and the space between the rails thereof in one of its tunnels or inclines in its coal mine, which defect was the proximate cause of a car getting beyond control and running down the incline upon and injuring him. The trial having resulted in a verdict and judgment in favor of the plaintiff, the defendant has appealed.

On November 11, 1910, at the time respondent received his injuries, he was employed as a coal miner by appellant. The incline through which the coal was being removed from the mine was several hundred feet long, and descended into the mine on about a six per cent grade. There branched off from this incline several rooms from which the coal was being mined. There was laid upon the incline a track consist-

ing of iron rails about two inches high and twenty-four inches apart, upon ties about four feet long. Branch tracks led into the several rooms. The cars which ran over the track in removing the coal were three and one-half feet high, two and one-half feet wide, and eight feet long, and each car when empty weighed about 850 pounds. Each car ran upon four ten-inch wheels, which were sufficiently open so that a stick of wood a foot or more long, called a sprag, could be inserted through a wheel and lock it by the sprag coming in contact with the body of the car. The cars were lowered into the mine along the incline by the miners themselves. A miner would place a sprag in a wheel of his car at the top of the incline, walk behind the car, and hold it from running away as he let it down the incline to the switch leading into his room where he was mining, where he would push the car into his room, and when he had filled it with coal, he would push it out to the incline track, where the driver with a mule would hitch onto the car and draw it out up the incline. The miner would then follow the car out, when he would in the same manner lower another car into the mine for filling. In this manner he would take down the incline, fill, and cause to be removed, from eight to twelve cars per day.

Respondent and one Zupitil, among other miners, were working in the mine in this manner. Respondent was working in a room off the incline, a short distance below the room in which Zupitil was working. On the morning of November 4, 1910, respondent and Zupitil were together at the top of the incline, ready to go to work. Respondent started down the incline with his car, followed by Zupitil with his car some twenty or thirty feet in the rear. When respondent reached a point in the incline almost opposite Zupitil's room, he stopped his car for the purpose of inserting an additional sprag in another wheel of the car. This, he testified, was rendered necessary because the grade of the incline changed at that point and was steeper beyond, and it was customary for him to stop his car at that point for that purpose. An instant

after he had stopped, and while he was reaching around to the side of the car to place the extra sprag in a wheel, his leg was caught between the bumpers of Zupitil's car and his own car, whereby he was seriously injured.

It seems that his stop would have been only for a few seconds, even had he not been overtaken by Zupitil's car, for evidently the placing of the extra sprag in a wheel was only the work of a moment. A short distance up the incline from where respondent stopped, probably twenty or thirty feet, being the distance at which Zupitil was following, a branch track led off into a room. Zupitil's testimony is, in substance, that, when he reached this point, he stepped into a hole or depression just behind the lead rail of the switch, and tripped upon the rail, causing him to fall and lose his hold upon his car. This resulted in its escaping from him and running down upon respondent. It only required a few pounds resistance to hold the empty car and control it with one sprag in the wheel on this part of the track. But when the car was released from Zupitil's hold, it gained some additional momentum, which, with its heavy weight, was sufficient to strike a heavy blow upon respondent's car, even though it had then acquired but little speed. There was no light in the mine except the lights carried by the miners upon their caps, and Zupitil while following behind his car could not see very well ahead, so as to plainly distinguish the condition of the ground between the rails along where he would have to walk. Both respondent and Zupitil had worked in the mine for a long time, and had such acquaintance with the conditions of the ground along between the rails as their frequent going in and out of the mine would furnish them. It was necessary to a proper operation of the mine to keep the ground between the rails suitable for the men and the mules to walk on, and it was so used a great deal. The constant passing over it by the mules caused holes to be worn between the ties, which required filling from time to time in order to keep the surface in a properly usable condition. Appellant's track man passed

along the track daily and inspected it with a view to keeping it in proper working· order, and this has reference to the ground between the rails as well as the track proper. The depression in which Zupitil stepped when he tripped and lost the control of his car was six to eight inches in depth from the top of the lead rail, and was very close to it, possibly extended under it. The lead rail is the rail of the branch track that crosses diagonally between the rails of the main incline track.

The allowing by appellant of the creation of the depression at the guide rail to the extent of six or eight inches below the top thereof without repair by filling in so as to make the ground comparatively smooth for the travel of the men, especially in lowering the cars along the incline, is the principal act of negligence relied upon by respondent for recovery, rested upon the theory that appellant thus violated its duty to respondent in failing to furnish him a reasonably safe place in which to work. Counsel for appellant argue that it would be imposing on appellant too high a degree of care to require it to keep the ground between the rails any freer from obstructions and depressions than is here shown. In view of the manner in which the miners were required to lower the cars along this incline, the fact that no light was furnished other than the lights in the miner's caps, the fact that the view of the track immediately ahead of a miner while lowering his car was in a measure obstructed by his car, and the fact that appellant's track man was present and passing over the track daily for the very purpose of inspecting and seeing to the keeping of the track, including the space between the rails in suitable condition for use, we think the question of the reasonable safety of the place was one for the jury, and that it cannot be determined in appellant's favor as a matter of law.

It is contended that, even though appellant did not fully comply with its duty in furnishing respondent a safe place to work, yet by reason of respondent's knowledge of the con-

ditions there existing, he assumed the risk of being injured in the manner here shown. It is true that respondent must have had some knowledge of the general condition of the ground between the rails over which he and the other miners had to walk in lowering the cars down the incline, but it seems to us, like the question of a reasonably safe place in which to work, the assumption of risk on the part of respondent became a question for the jury in view of the facts we have noted, and especially in view of the fact of the daily inspection of the track man for the purpose of seeing that the condition of the track, including the space between the rails, was suitable and safe for the purpose for which it was being used. We think that it cannot be decided, as a matter of law, that respondent was doing more than a reasonable man would do under the circumstances in his continuing to work there.

Counsel call our attention to, and place their principal reliance upon, the decision of this court in *Krickeberg v. St. Paul & Tacoma Lumber Co.*, 37 Wash. 63, 79 Pac. 492. We think, however, a critical reading of the facts of that case as there related will show that it is distinguishable from the case before us. In that case it is apparent that the injured plaintiff had a greater degree of control over the horse and truck he was driving than the miners could possibly have over their cars in this case. He even had a choice of tracks, as he was not compelled to have the wheels of his truck run in the same place upon each trip. He was working in the glare of electric lights, so that every defect and uneven feature of the plank road over which he was driving was plainly visible to him. It also appears that his truck had a tendency on previous occasions while he was using it to do the very thing that caused his injury. Nor did the mill company assume to render a daily inspection of the road over which the plaintiff was driving the truck. The following cases, cited and relied upon by counsel for appellant, we think are subject to substantially the same distinction: *French v. First Avenue R. Co.*,

24 Wash. 83, 63 Pac. 1108; *Ford v. Heffernan Engine Works*, 48 Wash. 315, 93 Pac. 417; *Mayer v. Queen City Lumber Co.*, 64 Wash. 567, 117 Pac. 392.

Some contention is made rested upon the alleged contributory negligence of respondent. We think the only possible foundation for this contention is found in the fact that respondent stopped upon the incline to put an extra sprag into a wheel of his car, without looking back to see if Zupitil's car was close upon him. It seems clear to us, in view of the fact that such a stop was customary with him, that it was apparently necessary, that it would in no event be for more than a few seconds, and that Zupitil would probably have control over his car, that the question of respondent's contributory negligence was for the jury. So far as the negligence of Zupitil is concerned, regarding such negligence as that of a fellow servant, we think the evidence is so devoid of any showing of negligence upon his part as to not call for comment from us touching that source of possible contributory negligence as a question of law.

It is contended that the trial court permitted the cause to go to the jury upon an issue of negligence not disclosed by the pleadings. This seems to be rested upon the fact that the negligence alleged in the pleadings refers to "obstructions" on the track and the space between the rails. It is argued that no evidence of obstructions was offered, and that the depression relied upon by respondents as an obstruction was in fact not an obstruction. This contention rests upon a too limited meaning of the word "obstruction." We think the word "obstruction" as there used applies to anything that interferes with, or renders dangerous, travel along the track, whether it consists of a physical object put there or of the removal of some portion of the traveled way. It has generally been so held when obstructions to public highways are spoken of; that is, a hole in a public highway or a ditch dug across it is in law an obstruction, the same as the building of a fence across it or the placing of any other

physical object there.   37 Cyc. 247.   In this sense, we think the depression into which Zupitil stepped, causing the loss of his hold upon the car, was an obstruction, and that the jury was warranted in believing that it was the proximate cause of respondent's injury.

The judgment is affirmed.

CROW, C. J., GOSE, CHADWICK, and MOUNT, JJ., concur.